### SCHALL v. MILLER, Alien Property Custodian, et al.

(Circuit Court of Appeals, Second Circuit. December 18, 1922.)

#### No. 137.

I. War &#9756;12—Form of report under Trading with Enemy Act not conclusive as to facts.

    That a transaction was reported to the Alien Property Custodian is not conclusive that it was one required to be reported, nor does the fact that it was placed on the form furnished under the schedule for "negotiable instruments and debts" preclude the person making the report from showing the facts.

2. War &#9756;12—Instrument held not to create trust in favor of enemy alien.

    In January, 1915, plaintiff, an American citizen, executed a paper by which he "agreed" to pay to his father, who was a German subject, then resident in Germany, interest on $200,000, out of his interest in an American banking partnership which had previously been transferred to him by his father in good faith, and which was valued at $300,000. He also promised, in case of dissolution, to pay to his father $200,000, in-

creased or diminished by profits or losses to the time of dissolution. By arrangement with the firm each six months such interest was charged to plaintiff's account and credited to his father's account. When the United States entered the war, the firm was dissolved and its assets divided. Plaintiff retained the paper, and his father had no knowledge of it until long after the war ended. Plaintiff reported the facts to the Alien Property Custodian, who demanded and took possession of securities aggregating more than $200,000 in value. *Held*, that the undelivered paper, signed without other consideration than filial affection, did not create an indebtedness from plaintiff to his father, nor make him trustee of any property for his father's benefit, and that plaintiff was entitled to recover back the securities under Trading with Enemy Act, § 9 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½e), as his own property.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity by Frederick Muller Schall, Jr., against Thomas W. Miller, Alien Property Custodian, and Frank White, Treasurer of the United States. Decree for complainant, and defendants appeal. Affirmed.

William Hayward, U. S. Atty., of New York City (Adna R. Johnson, Jr., Dean Hill Stanley, and D. Q. Morrow, Sp. Asst. Attys. Gen., of counsel), for appellants.

Avery & Whiting, of New York City (Earl B. Barnes, of New York City, of counsel), for appellee.

Before ROGERS, MANTON and MAYER, Circuit Judges.

MAYER, Circuit Judge. The suit is brought under section 9 of the Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½e) to recover securities delivered and money paid to the Alien Property Custodian during 1918 and 1919. The decree below ordered the Alien Property Custodian to deliver to plaintiff Liberty bonds of the par value of $52,500 and cash in the amount of $164,-001.94. The record shows a careful and complete trial of the issues and a comprehensive opinion by the District Court, devoted mainly to a consideration of the facts. It is apparent from the opinion that the District Court considered, in view of its findings as to the facts, that the so-called questions of law required little discussion. Because we agree with the District Court in its view of the facts, it will be necessary to set forth only the essential features of the testimony.

Plaintiff, an American citizen, born in New York City in 1889, is the only son of Frederick M. Schall and Mary Theresa Schall. His father was a German national, and his mother, a daughter of a naturalized American citizen, who was the founder of the banking firm of William Schall & Co., of New York City. For many years prior to January 1, 1915, plaintiff's father was head of the banking house of Muller, Schall & Co., of New York City. From 1897, however, he had resided in London and Bremen, and had not taken an active part in the conduct of his firm's business. On January 2, 1915, plaintiff's father retired from the firm in favor of plaintiff, and gave to plaintiff the sum of $300,000; that being the amount of the father's fixed capital interest in the firm at this time. This retirement was in accord-

ance with the tradition of the firm that "the sons follow the father," and was the consummation of a family plan entertained since plaintiff's birth. The legal details were appropriately carried out by reputable New York attorneys. The transfer of the father's interest was hastened to some extent because of difficulties which the firm was experiencing with the British blacklist in the fall of 1914, due presumably to the German citizenship of Schall, Sr.

Late in January or early in February, 1915, approximately a month after this transfer from father to son had been made, plaintiff received a letter from his father confirming the gift, but expressing apprehension as to his own future financial condition, in view of the uncertainties created by the war. Plaintiff thereupon consulted Mr. Dillingham, a well-known attorney of New York City, with the view of making some provision by which his father's income might be augmented, and in the event of plaintiff's death prior to the decease of his father the sum of $200,000 from plaintiff's capital interest in the new firm might be at the disposal of the father.

Plaintiff suggested to Mr. Dillingham that he cover the point in a will or codicil; but Mr. Dillingham advised a paper similar in form to one which had been drafted in December, 1914, at a time when the precise amount of the settlement which the father intended to make upon the son was not known, and the form in which the transaction would be carried out had not been determined. The original of this paper was introduced in evidence at the trial as Exhibit 17, noted at the end of this opinion.

Plaintiff signed this paper and placed it in the compartment of the safe where he kept other papers belonging to him. There this Exhibit 17 remained until November, 1921, at which date, during plaintiff's absence on a business trip, it was delivered to his solicitors in this suit by his uncle. No copy of Exhibit 17 was sent to plaintiff's father, and its existence was not known to the father until long after the war had ended. Neither the original nor a copy was ever shown to any of plaintiff's partners until December, 1917, when the question arose as to whether its execution should be reported to the Alien Property Custodian.

About the date of the execution of Exhibit 17 (which was, as noted supra, subsequent to January 2d), plaintiff arranged with the other members of the new firm of Muller, Schall & Co. for an allowance to himself of 6 per cent. interest on $200,000 of his capital (instead of the 5 per cent. provided by the articles of copartnership), and gave instructions that his personal account should be charged and his father's personal account should be credited semiannually with the sum of $6,000 as "interest" at 6 per cent. upon $200,000.

After the enactment of the Trading with the Enemy Act, plaintiff consulted counsel as to reporting to the Alien Property Custodian the execution of Exhibit 17, and, pursuant to their advice, he reported the transaction on a form prepared and supplied by the Alien Property Custodian under schedule 8, reserved for "Negotiable Instruments and Debts." Demand was thereafter made by the Alien Property Custodian for the payment of the amount which that official deter-

mined was due from plaintiff to his father, and during 1918 and 1919 securities and cash of the value of $213,549.68 were delivered and paid by plaintiff to the depositary designated by the Alien Property Custodian. Notice of claim, pursuant to section 9 of the Trading with the Enemy Act, was duly thereafter filed, and application was made for executive allowance. This application was denied, and hence this suit.

[1] It may be first stated that we agree with the District Court in finding unequivocally as a fact that the transfer from father to son was made in complete good faith, and not in any manner in connection with Exhibit 17, or any promise or arrangement between father and son that the latter should execute such a paper. Some emphasis is laid upon the fact that plaintiff reported to the Alien Property Custodian, and in the course of that report referred to Exhibit 17 as an agreement. There was no other course for plaintiff to pursue. If the construction of Exhibit 17 were as the Alien Property Custodian contends, then plaintiff's failure to report might have subjected him to serious hazards, involving possible criminal prosecution. The situation is one which is now no longer unfamiliar to the courts, where, in such circumstances, both during the active period of the war and during the period when we were technically at war, an American citizen might have been subjected to great danger, if through an error of judgment he failed to report in respect of property which he believed belonged to himself, but which the government, through its officials, might regard as belonging to some person who was an enemy.

The fact that report was made under the schedule referred to does not carry the slightest significance, as the form was not prepared by plaintiff, and filling in the data under this schedule on this printed form did not change the facts, and plaintiff was in no way precluded from showing these facts.

[2] This leaves as the only question requiring consideration the legal effect of Exhibit 17, bearing in mind that that paper was never delivered nor made known to the father until after the war was over, and that there was no consideration therefor, except the filial affection of a dutiful and self-respecting son. It is not necessary to discuss whether Exhibit 17 created a debt owing from plaintiff to his father or a gift in presenti, nor do we understand that any such contentions are seriously pressed. It is urged, however, that Exhibit 17 created a trust in favor of the father to the extent of $200,000 interest in the partnership of Muller, Schall & Co.

Perhaps the best method of disposing of this contention is to refer briefly to some of the cases relied upon. In Locke v. F. L. & T. Co. et al., 140 N. Y. 135, 35 N. E. 578, the principal question upon this point was whether the author of a trust of personal property could make himself the trustee, and the question was answered in the affirmative. In the case at bar, there is no attempt by plaintiff to make himself a trustee, nor is any other trustee provided for. In the Locke Case the court pointed out that the settlor selected out and separated four certificates of stock from his general estate. In other words,

he carved out of the res certain definite personal property. No such intent can be found in nor result flow from Exhibit 17.

In Martin v. Funk, 75 N. Y. 134, 31 Am. Rep. 446, the intestate deposited $500 in a savings bank in trust for another. In other words, she did the act which constituted herself a trustee, and it was held that the retention of the passbooks, which were simply the vouchers for the definite res, must be deemed to have been so held as trustee.

In the interesting case of Hamer v. Sidway, 124 N. Y. 538, 27 N. E. 256, 12 L. R. A. 463, 21 Am. St. Rep. 693, the testator agreed with his nephew that, if the latter would refrain from drinking liquor, using tobacco, playing cards for money, etc., until he should become 21 years of age, he would pay his nephew $5,000. The nephew performed his part of the agreement, and, soon after he became of age, wrote to his uncle, advising him accordingly, and stating that the sum specified was due him, and asking payment. It was thereupon agreed between nephew and uncle that the money should remain in the hands of the uncle on interest. Here again there was a definite res, and, as the court held, an executed trust, and the result was the relation of trustee and cestui qui trust.

This case can hardly be said to have any resemblance to the situation presented by Exhibit 17. On the contrary, the case at bar bears a closer resemblance to Ambrosius v. Ambrosius, 239 Fed. 473, 152 C. C. A. 351 (cf. Bennett v. Littlefield, 177 Mass. 294, 58 N. E. 1011) and Judge Ward, in the Ambrosius Case, supra, distinguished various cases sufficiently to require no further exposition for the purposes of the case at bar. Here there was no definite res, no setting apart, not even a single constituent of the elements which the cases have held necessary in order to create a trust of personal property.

But it is urged, if Exhibit 17 is to be considered as executory, and as not passing title to the father when it was executed, then nevertheless that, upon the dissolution of the partnership of which plaintiff was a member, Exhibit 17 somehow became an executed trust. Attention is called to the fact that the partnership was dissolved by the terms of an agreement called Exhibit No. 8 when war was declared against Germany by the United States. There is no merit in this contention, for it will be noted that the provision concerning the event of dissolution in Exhibit 17 did not create any trust at the time Exhibit 17 was signed by plaintiff, but amounted merely to a promise to pay the father the sum of $200,000, less increases or decreases in the event of dissolution. This promise did not and could not set aside a definite res at the time of the execution of Exhibit 17, and did not, either by language or intent, constitute plaintiff at that time a trustee, and his father the beneficiary of a trust. This provision amounted merely to a naked promise to give a sum in the future which might be increased or decreased under the contingencies named in the agreement, and this promise of an executory nature was made without a valuable consideration. Matter of Wilber v. Warren, 104 N. Y. 192, 10 N. E. 263.

The happening of the partnership dissolution did not create a trust; and it must be obvious that whether or not a trust was created must be determined by the paper, Exhibit 17, and the acts of plaintiff in

connection therewith. A satisfactory statement as to the elements and requisites of express trusts will be found in 39 Cyc. 34 et seq., and the case at bar does not meet the requirements from the standpoint either of academic discussion or authoritative cases.

Plaintiff has long been deprived of what we hold to be his property, and we are of opinion that he should be aided in speedily recovering the same. For this reason, the mandate will issue forthwith.

Decree affirmed.

### Plaintiff's Exhibit No. 17.

I, the undersigned, Frederick Muller, Schall, Jr., of New York City in consideration of the assignment to me by my father, Frederick Muller Schall Sr., of Bremen, Germany, by instrument executed contemporaneously herewith, of his share and interests in the capital, assets and property of the firm of Muller Schall & Co., of New York City (formed by articles of copartnership. dated September 28, 1897), of which firm I this day become a member in place of my said father, who withdraws from said firm, do hereby agree with my said father his executors and administrators, as follows:

1. On each 30th day of June and 31st day of December during the continuation of said firm of Muller, Schall & Co., I will pay to my said father interest at the rate of 6 per cent. per annum upon $200,000, being the equivalent of the amount by which the value of the share in said capital, assets and property of said firm so assigned to me exceeds the sum of one hundred thousand ($100.000) dollars, as of this day, according to the valuation of the assets of said firm made and entered on its books as of the 31st day of December, 1914: Provided, that the amount upon which I shall pay interest as aforesaid shall be increased at the end of each six months period by an amount equal to my share of the net profits. if any, derived by said firm from the sale, disposal or liquidation of any of its assets and property this day in hand and so liquidated and disposed of during such six months period at a price or prices exceeding the valuation of such assets and property so entered on said December 31, 1914, and that said amount shall be decreased at the end of each six months period by an amount equal to my share of the losses, if any, incurred by said firm through the sale, liquidation or disposal of any of its said assets and property during said six months period at a price or prices less than the valuation of such assets and property so entered on its books as of said December 31, 1914, there being first applied against such losses, the "reserve fund" set apart on the books of said firm to meet the same.

2. Upon the dissolution of said firm by death or otherwise, or as soon thereafter as its affairs can be liquidated and my distributive share in its capital assets and property fixed and determined, I will pay to my said father the said sum of $200,000: Provided that this sum shall be increased or decreased, as the case may be, by an amount equal to my share of the net profits derived or the net losses incurred by said firm through the sale, liquidation or disposal at or prior to such dissolution, of its said assets and property this day in hand at prices greater or less than the valuation of said assets so entered on the books of said firm as of December 31, 1914; and provided, further, that if the total value of my capital and interest in said firm at the time of such dissolution is found to be less than the amount payable to my father as above fixed, then said amount shall be reduced to an amount equal to the value of my said capital and interest at such time.

Witness my hand and seal, in the city of New York. this 2d day of January, 1915.　　　　　　　　　　　　　　　　　Frederick Schall, Jr. [Seal.]