### BECKER v. MILLER et al.

(Circuit Court of Appeals, Second Circuit. March 20, 1925.)

No. 267.

**1. War ⊂⇒12—Language of report made to Alien Property Custodian was what counted.**

Mere making of a report to Alien Property Custodian under Trading with the Enemy Act, that plaintiff held money for benefit of his alien brother or company, was in itself not conclusive in action under section 9, as amended (Comp. St. Ann. Supp. 1923, § 3115½e), against the custodian, but language thereof was what counted.

**2. War ⊂⇒12 — Evidence held to show that plaintiff's statement to Alien Property Custodian that money was held for alien brother or company was not voluntary.**

Evidence held to show that plaintiff's statement, made to Alien Property Custodian under Trading with the Enemy Act, § 9, as amended (Comp. St. Ann. Supp. 1923, § 3115½e), to effect that "saving" realized from sale of tungsten to his alien brother during the war was

held for benefit of such brother or his company, was not voluntary but under duress, and hence plaintiff was not estopped from alleging and pleading the contrary.

**3. Evidence ⊂⇒594—Suspicion should not outweigh uncontradicted evidence.**

Suspicion should not outweigh uncontradicted evidence.

**4. War ⊂⇒12—Evidence held to show that "saving" realized from sale of tungsten during war was not held by plaintiff for benefit of alien brother or his company.**

Evidence held to show that money deposited by plaintiff with Alien Property Custodian, representing a "saving" on a purchase of tungsten, sold by plaintiff to his German brother during the war, constituted the property of plaintiff, and was not held for benefit of the German brother or his company, and hence plaintiff was entitled to recover it back under Trading with the Enemy Act, § 9, as amended (Comp. St. Ann. Supp. 1923, § 3115½e).

**5. United States ⊂⇒110—United States not liable for interest on property wrongfully held by Alien Property Custodian.**

United States was not liable for interest on property wrongfully held by Alien Property Custodian.

Appeal from the District Court of the United States for the Southern District of New York.

Suit by Adolf J. Becker against Thomas W. Miller, as Alien Property Custodian, and others, in which the named defendant counterclaimed. From a decree of dismissal, and judgment on defendant's counterclaim, plaintiff appeals. Reversed and remanded, with directions.

Suit is under section 9 of the Trading with the Enemy Act, as amended (Comp. St. Ann. Supp. 1923, § 3115½e).

Plaintiff is a citizen born in Germany, and naturalized in 1907. In and before 1916 he was the vice president and one Peters (an unnaturalized German), was the president of Becker Steel Company of America, a corporation of West Virginia.

Plaintiff's brother, Reinhold Becker, a German subject, was at the same time director general of Stahlwerck Becker, a German corporation, engaged in business at Crefeld, Germany. Despite the relationship of the Beckers, it is admitted that there was no connection between the German and American corporations.

In the summer of 1916 plaintiff was in Germany and with his brother. At that time tungsten and vanadium were extremely scarce in Germany; the prices there of the metals were much higher than in the United States. Plaintiff testified (his brother con-

firming) that, on Reinhold's inquiring whether plaintiff could not get some of these metals for Reinhold's corporation, he said that he could get it "if you [Reinhold] can look out for the shipping"; whereupon Reinhold replied, in substance, that he would send over to plaintiff about $140,000, if with that money plaintiff could buy about 15 tons of tungsten and·10 of vanadium, it would be satisfactory, and, if the metals could be obtained for less, the plaintiff could keep the saving for himself. At this time the German price for these metals was more than three times the then current American price; but, as is well known historically, the difficulty of getting any materials into Germany through the British blockade was enormous. Plaintiff returned to the United States and consulted with Peters concerning the possible purchase. Then he was called away to another part of the country on some business of his company's, and Peters actually arranged for purchases at prices which at the end of August, 1916, would have required slightly more than $139,000. On October 6, 1916, Reinhold Becker sent by radio order $140,-000 to a firm of New York bankers to the order of Becker Steel Company. This amount was soon transferred to plaintiff's individual account in a New York Trust Company, and with it the alleged agreed amount of tungsten and vanadium was purchased; but prices had so decreased between August and October that the metals were obtained at a saving out of the $140,000 of $22,958.

The method of transportation arranged for by Reinhold Becker was on the German Commercial U Boat Deutschland, which at New London, Conn., took on board the 15 tons of tungsten, but did not have room to take the vanadium, which was therefore left behind, subsequently taken to West Virginia, and sold at a considerable profit.

The proceeds of the sale of vanadium were turned in to the Becker Steel Company to the credit of Reinhold Becker, and there remained until the outbreak of war between Germany and the United States. But the saving on the entire purchase was, in November, 1916, divided by plaintiff between himself and Peters, and his share thereof he either spent or invested before April 6, 1917.

In due time Becker and Peters were summoned before the Alien Property Custodian's agent, and the above story was by them told, as is substantially admitted.

The proceeds of the vanadium were delivered to the Custodian without demur; but the Custodian demanded of plaintiff the whole of the saving aforesaid. Plaintiff protested that it was his own property, and was (as he says), told that if he did not give it up he would be interned, notwithstanding his citizenship, at Ft. Oglethorpe; whereupon after much protesting and bringing his counsel to expostulate with the Custodian's representative he submitted (as he says), under duress, and signed a return by which he admitted, in substance, that the $22,958 was held by him "for the benefit of 'my brother Reinhold Becker or Stahlwerck Becker A. G. as their interests may appear." Plaintiff says that he could not get, because some he had spent, all of the amount thus demanded; but Peters gave up his share, and plaintiff gave up what he had left.

This suit was brought to recover what plaintiff asserted he had paid under duress; the Custodian filed a counterclaim demanding judgment for what plaintiff said he was unable to pay. The court below dismissed the bill and gave judgment on the counterclaim, whereupon plaintiff appealed.

Townsend & Kindleberger, of New York City (E. Crosby Kindleberger and James C. Higgins, both of New York City, of counsel), for appellant.

William Hayward, U. S. Atty., of New York City, and Adna R. Johnson, Jr., and Dean Hill Stanley, Special Asst. Attys. Gen., for appellees.

Before HOUGH, MANTON and HAND, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). We first inquire whether plaintiff, after having made the report he did, can maintain this action.

[1] The mere making of a report is in itself nothing; it is the language thereof that counts. Schall v. Miller (C. C. A.) 287 F. 502. The report in the case cited was drawn with more care than the one at bar; for, if the report in this case be taken as a voluntary performance on the part of the plaintiff, the result he then admitted is in the teeth of the facts he now alleges. On this point it is to be remembered that plaintiff and Peters were practically called to the Custodian's office in New York and ordered to sign this report; we are satisfied by the evidence that it was extorted from them. To be sure, Peters did not sign; but, as he gave up his share of the "savings" by handing it back (or "loaning" it, as he says) to plaintiff, all necessity for signature on his part was gone.

This occurred in 1918 when war was flagrant. Peters was a German subject and an alien enemy. Becker was, to be sure, a naturalized citizen, but there are no signs that his naturalization had "taken" very thoroughly. The evidence convinces us that they were badly frightened by the Custodian's agent, who indulged in threats that if Becker did not sign means would be found of sending him to Oglethorpe.

[2] We hold that the statement relied on by the Custodian, to the effect that the money was held for the benefit of the German brother or his company, was not voluntary, and plaintiff is not estopped from alleging and pleading the contrary.

Thus is reached the second inquiry, which is but a question of fact, viz.: Was the "savings" fund the property of plaintiff? Undoubtedly suspicion is at once aroused; the very unanimity of the stories now told by Adolf and Reinhold Becker to the effect that there was an agreement made in the early summer of 1916 that whatever was saved out of the $140,000 should belong to Adolf is not attractive. It does not seem good business. Yet it must be remembered that the purchase was at best a sort of gamble. If tungsten could be gotten into Germany, the gain would be enormous; but the chance of getting through the blockade, and by means of a cargo carrying submarine, rendered the enterprise unique. It was not a sound "business" venture, and business rules did not apply.

[3] It is also easy to point out that the whole story might have been concocted as a method of disposing of what was left of the $140,000—a sum sent to plaintiff by his brother not pursuant to any promise made earlier in the summer of 1916, but as a result of Peters' estimate of cost made at the end of August of that year. But there is no evidence of anything of the kind; it is all suspicion; and that suspicion should not outweigh uncontradicted evidence is quite strikingly shown in a recent decision by the Third Circuit in Miller v. Herzfeld (opinion filed February 26, 1925), 4 F.(2d) 355, a case under this statute where improbability and suspicion might well have been given greater weight than in the present case.

In our opinion the undoubted fact that decisively turns the scale in favor of the plaintiff is that in the fall of 1916—a time when political parties in this country were vying with each other in expressing love of peace and aversion to war—this plaintiff actually took as his own, and largely spent as his own, the fund which is the subject of this controversy.

There are no aspersions on his honesty in respect to his own family at all events, and, if he had not assurance that the money was his own, so that he could take it with good conscience, the question is crucial why did not he and Peters similarly appropriate the considerably larger sum equally within their control and arising from the profitable resale of the vanadium shut out of the Deutschland?

[4, 5] If the Custodian's contention is correct, plaintiff was dishonest; but, if he was dishonest as to one fund, why not as to the other? Equally is it impossible to explain why, if plaintiff and Peters merely sought to conceal the fund in controversy, they did not similarly attempt to conceal the larger vanadium fund. These questions cannot be answered so as to justify the decree below.

It is accordingly ordered that said decree be reversed, and the cause remanded, with the directions to grant the prayer of the bill, except as to interest—a point ruled by our recent decision in Henkels v. Miller (opinion filed January 5, 1925) 4 F.(2d) 988.